UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

NATURAL RESOURCES DEFENSE                17 Civ. 6989
COUNCIL,

                    Plaintiff,           OPINION

        -against-

U.S. DEPARTMENT OF ENERGY,

                    Defendant.

------------------------------------X


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE       2-22-19

A P P E A R A N C E S:

            Attorneys for Plaintiff

            DEMOCRACY FORWARD FOUNDATION
            1333 H Street, NW – 11th Floor
            Washington, DC 20005
            By:  Javier M. Guzman, Esq.
                 Jeffrey B. Dubner, Esq.

            Attorneys for Defendant

            U.S. ATTORNEY'S OFFICE, S.D.N.Y.
            86 Chambers Street, 3rd Floor
            New York, NY 10007
            By:  Talia Kraemer, Esq.

**Sweet, D.J.**

There are four motions pending in this action
involving significant issues of administrative law and judicial
review. The defendant, the Department of Energy ("DOE" or the
"Defendant") has moved pursuant to Rules 12(b)(1) and 56 of the
Federal Rules of Civil Procedure to dismiss the amended
complaint ("AC") of plaintiff Natural Resources Defense Council
("NRDC" or the "Plaintiff") for lack of jurisdiction, or
alternatively, for summary judgment. ECF No. 29. DOE has also
moved to dismiss the AC as moot pursuant to Rule 12(h)(3) of the
Federal Rules of Civil Procedure. ECF No. 56. NRDC has cross-
moved for summary judgment and to supplement the Administrative
Record ("AR") pursuant to the Administrative Procedures Act
("APA"). ECF Nos. 38, 40. Based on the facts and conclusions set
forth below, the motion of DOE for dismissal for lack of
jurisdiction and for summary judgment are denied, as is its
motion to dismiss on mootness grounds; the motion of NRDC to
supplement the AR and its cross-motion for summary judgment are
granted.

## I.  Prior Proceedings

1

This action was commenced on September 14, 2017 by NRDC to challenge DOE's issuance of a stay under Section 705 of the APA of its Test Procedure Rule. ECF No. 1. NRDC's AC was filed on March 15, 2018. ECF No. 25.

By this Court's Opinion dated March 6, 2018, the motion of the DOE to transfer the action was denied. ECF No. 23.

The motion of DOE for dismissal or summary judgment, NRDC's cross-motion for summary judgment, and NRDC's motion to supplement the AR were heard and marked fully submitted on September 12, 2018, as was DOE's motion to dismiss this action as moot.

## II.   **Background and Facts**

The parties have not submitted statements of fact pursuant to Local Civil Rule 56.1 because the facts are set forth and cabined by the AR. *See Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012) (opining that cases based on the review of an administrative record "present[] only a question of law" and directing parties not to submit Local Rule 56.1 statements); *Karpova v. Snow*, 402 F. Supp. 2d 459, 465 (S.D.N.Y. 2004) (summary judgment appropriate

without submission of statements of undisputed material facts in APA cases because the administrative record provides the court with "all of the information necessary to determine whether material disputes of fact exist").

The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201 *et seq.*, authorizes DOE to adopt energy conservation standards for consumer products and set test procedures by which manufacturers certify their products' compliance with applicable standards. EPCA requires DOE to periodically review and strengthen its energy conservation standards, *id.* § 6295, and to review and amend its test procedures to "more accurately" measure a covered product's energy efficiency, *id.* § 6293(b)(1)(A).

Carrying out that obligation, DOE conducted several years of rulemaking proceedings in 2008 to update and strengthen the energy efficiency standards and test procedures for central air conditioners and heat pumps. This extensive process resulted in final rules in 2011 (the "2011 Rule") and 2016 (the "2016 Rule") to refine the regulations related to central air conditioners and heat pumps.

A significant part of these proceedings—including "proposals and comments from three separate rulemakings, two guidance documents, and two working groups," 81 Fed. Reg. at 36,994—dealt with "split systems," air-conditioning systems that consist of an outdoor unit and an indoor unit. *See generally id.* at 36,996 (defining "split systems"). When an outdoor unit breaks down, it is often possible to replace that unit with an "unmatched" outdoor unit, without replacing the existing indoor components. Until 2016, however, DOE did not have a clear process for testing and certifying unmatched outdoor units. *See* U.S. DEP'T OF ENERGY, ENFORCEMENT POLICY STATEMENT: SPLIT-SYSTEM CENTRAL AIR CONDITIONERS WITHOUT HSVC (Dec. 16, 2015), https://www.energy.gov/sites/prod/files/2015/12/f27/Enforcement%20Policy-CAC%202015_0.pdf (acknowledging that many split systems "cannot be tested in accordance with the DOE test procedure"). This led to widespread noncompliance, particularly for "dry-shipped" units—that is, unmatched outdoor units that are shipped separately from the refrigerant needed to operate them. *Id.* The 2016 Rule redesigned the test procedures to require dry-shipped outdoor units to be paired for certification purposes with an indoor unit representative of the older, less-efficient indoor units they are typically paired with in practice. *See* 81 Fed. Reg. at 37,008-09.

4

After DOE issued the 2016 Rule, Johnson Controls Inc. ("JCI") began marketing a new type of unmatched outdoor unit that shipped with one refrigerant, R-407C, but was compatible with a different refrigerant, R-22—a hydrofluorocarbon ("HCFC") with one of the "highest ozone depletion potentials of all HCFCs," which the Environmental Protection Agency ("EPA") has been phasing out. EPA, PHASEOUT OF CLASS II OZONE-DEPLETING SUBSTANCES, https://www.epa.gov/ods-phaseout/phaseout-class-ii-ozone-depleting-substances; *see also* AR 102. EPA had banned the sale and distribution of new systems designed to use R-22, but JCI's new outdoor units could operate as replacement R-22 units without complying with either the ban on R-22–equipped units or DOE's test procedures for unmatched units shipped without their intended refrigerant. *See* 81 Fed. Reg. at 81,170.

On August 24, 2016, DOE published a Supplemental Notice of Proposed Rulemaking to close this loophole. *See* Energy Conservation Program: Test Procedures for Central Air Conditioners and Heat Pumps, 81 Fed. Reg. 58,164 (Aug. 24, 2016) ("2016 SNOPR"). The 2016 SNOPR proposed to require all unmatched outdoor units that are compatible with R-22 to be certified through the same test procedures as units shipped with R-22, even if they shipped with a different refrigerant. *See id.* at 58,171. After considering comments from JCI and other industry

participants, as well as NRDC and other efficiency, environmental, and consumer groups, DOE published the Test Procedures Rule on January 5, 2017. AR 350-515. As proposed in the 2016 SNOPR, the Test Procedures Rule required that units compatible with R-22--in practice, only JCI's R-407C units--be tested the same way as unmatched outdoor R-22 units themselves. AR 358. The effective date for the Test Procedures Rule was February 6, 2017, with a compliance deadline of July 5, 2017. AR 350.

## A. DOE Delays the Test Procedures Rule Twice, Opposed by All But One Manufacturer

On January 20, 2017, the White House Chief of Staff directed agencies to "temporarily postpone" the effective date of all regulations that had not yet become effective, "as permitted by applicable law." Memo. from Reince Priebus to Heads of Exec. Dep'ts & Agencies (Jan. 20, 2017) (the "Preibus Memo"), https://www.whitehouse.gov/presidential-actions/memorandum-heads-executivedepartments-agencies/. On February 2, 2017, without notice or opportunity to comment, DOE published a final rule purporting to postpone the Test Procedures Rule's effective date by 60 days. AR 349 (the "February Final Rule"). The sole basis for this delay was "to give DOE officials the opportunity

6

for further review and consideration of new regulations" in light of the Preibus memo. *Id.*

The February 2, 2017 delay--and the prospect DOE might delay the Test Procedures Rule again--came to the attention of industry participants who opposed any delay. One manufacturer of central air conditioners, Lennox International ("Lennox"), sent a letter to DOE on March 17, 2017, explaining that the Test Procedures Rule "was crafted during a negotiated rulemaking . . . with broad stakeholder involvement" and "has broad industry support, because it makes many improvements to the test procedure." AR 320. Lennox cautioned that "[i]f this negotiated outcome is delayed or overturned, industry will either be subject to the existing inferior test procedure or will be at the mercy of yet another federal rulemaking." AR 321.

On March 21, 2017, without any advance notice or opportunity to comment, DOE published another final rule purporting to further postpone the Test Procedures Rule's effective date, this time to July 5, 2017, the rule's original compliance date. AR 348 (the "March Final Rule"). The sole basis for this delay was to provide the Secretary of DOE more time "for further review and consideration of new regulations." AR 348.

Two days later, the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), an industry trade association representing more than 300 manufacturers of air conditioners and related equipment, supported the Test Procedures Rule. AR 322. AHRI explicitly stated that it "is not seeking to delay or rescind the [Test Procedures Rule]." *Id.*

On April 12, 2017, Lennox expanded on the reasons the Test Procedures Rule should be "implemented without further delay" in a detailed twelve-page letter. AR 324-25. Lennox noted that "JCI is in the unique position in the industry of [seeking to certify] products with R-407C refrigerants in residential applications." AR 324. It then provided several arguments against further delay in subjecting those products to the updated test procedures, explaining both the Test Procedures Rule's lawfulness and the negative impacts of a delay on consumers, industry, and energy efficiency. AR 324-35. JCI responded on May 22, 2017 disagreeing with Lennox's arguments. AR 336-42. Lennox replied to these assertions a month later in a June 28, 2017 letter. AR 343-46.

B. JCI Petitions for Review in the Seventh Circuit and Privately Petitions DOE for an Extension, Waiver or Stay

Meanwhile, JCI petitioned for review of the Test Procedures Rule in the Seventh Circuit and sent three non-public submissions to DOE, asking for individual relief.

Specifically, JCI filed its petition for review in the Seventh Circuit on March 3, 2017. AR 107-08. That same day, JCI confidentially petitioned DOE for a 180-day extension under 42 U.S.C. § 6293(c)(3). AR 98-103. JCI asserted that it would experience a "substantial hardship" because some of its R-407C units would be unable to obtain certification under the new test procedures and that the R-407C provisions of the Test Procedures Rule violated EPCA. AR 100-01.

On April 6, 2017, JCI sent another confidential petition to DOE for a waiver from two provisions of the Test Procedures Rule under 10 C.F.R. § 430.27. AR 90-95. JCI asserted that applying the provisions would be "so unrepresentative of [its R-407C units'] true energy consumption characteristics as to provide materially inaccurate comparative data." AR 90. It also acknowledged that it was "not aware of any other manufacturer of residential split-system central air conditioners, or components of residential split-system central air conditioners, approved for use with R-407C." AR 86.

9

On April 28, 2017, the Seventh Circuit suspended all briefing on JCI's petition for review so that the parties could conduct mediated settlement discussions. AR 315-17.

On May 31, 2017, JCI requested that DOE issue an administrative stay under Section 705 pending the resolution of the Seventh Circuit case. AR 68-73. It acknowledged that in "reviewing an application for stay" the four factors considered in any request for injunctive relief "must be balanced against one another." AR 69. If it did not receive relief within a week, JCI claimed, it would "file a request for judicial stay with the Seventh Circuit . . . in order to give the Court sufficient time to act on that request before the July 5th compliance deadline." AR 73.

DOE granted JCI's March 3rd request for a 180-day extension on June 2, 2017. AR 66-67. Three days later, JCI asked DOE to hold its request for a stay in abeyance. AR 64-65. Lennox challenged the 180-day extension in federal district court in Texas on June 29, 2017, simultaneously moving for an emergency stay. AR 6. In its motion, Lennox explained that it was "not ask[ing] to be held to a less-accurate testing and representations requirement" than provided by the Test

10

Procedures Rule, but rather "that JCI not be given the unique
ability to rely on misleading test data for six months while
Lennox and others in the industry are governed by regulations
that protect consumers." AR 42. The court denied Lennox's motion
on June 30, 2017, finding that Lennox's alleged injuries would
not be irreparable. *See* Order, Lennox Int'l Inc. v. DOE, No. 17-
Civ. 1723 (N.D. Tex. June 30, 2017), ECF No. 16. In light of
this defeat, Lennox voluntarily dismissed its case on July 17,
2017. Notice of Dismissal, Lennox Int'l Inc. v. DOE, No. 17-Civ.
1723 (N.D. Tex. July 17, 2017), ECF No. 22.


   C. DOE Stays the Test Procedures Rule


        As the twice-rescheduled July 5, 2017 effective date
approached, nobody in the industry was asking DOE to stay the
Test Procedures Rule. JCI had withdrawn its request for a stay,
AHRI had weighed in against a delay, and Lennox had explicitly
disavowed the idea of levelling down the test procedures to hold
all manufacturers to the same low standard as JCI.


        However, on July 12, 2017, DOE filed a stay of the
Test Procedures Rule's R-407C provisions with the Office of the
Federal Register ("OFR"). SAR 1-25 (the "Delay Rule"). DOE's
explanation, in its entirety, read as follows:

> DOE has determined that, during the pendency of
> the lawsuit brought by JCI, it is in the
> interests of justice to postpone the
> effectiveness of the [R-407C provisions]. DOE has
> determined to postpone the effectivenes [*sic*] of
> these provisions based on JCI's submissions to
> DOE that raise concerns about significant
> potential impacts on JCI, and further to ensure
> all manufacturers of central air conditioners and
> heat pumps have the same relief granted to JCI.

SAR 2. The effect of the stay is to permit JCI to continue to
sell air conditioners whose efficiency falls below DOE
standards. *See* AR 102.

Although the Delay Rule was not filed with OFR until
July 12, 2017 or published until July 13, 2017, it asserts that
it was "[i]ssued" on July 3, 2017. SAR 2. DOE submitted an
unpublished version of the stay to the district court hearing
Lennox's suit on July 3, 2017 and, according to DOE, a
contractor posted that version on a DOE website the same day.
See Def.'s Mem. Supp. Mot. Dismiss & Summ. J. 6, ECF No. 30.

III. **DOE's Motions to Dismiss for Lack of Jurisdiction Are
Denied**

A. DOE's Motion to Dismiss in Light of the Seventh
Circuit Litigation is Denied

DOE contends, "[f]or the reasons stated in [its] memoranda of law in support of its motion to transfer this case to the Seventh Circuit," that this Court this lacks jurisdiction over NRDC's amended complaint. *See* Def.'s Mem. Supp. Mot. to Dismiss & Summ. J. 7-9, ECF No. 30. According to DOE, evaluating DOE's decision to administratively stay the Test Procedures Rule would "overly entangle this Court" with issues involved in the Seventh Circuit litigation. *Id.* 8. However, as the Court stated in its Opinion denying transfer of this case to the Seventh Circuit:

> "[T]here is no overlap between the present action and the litigation in the Seventh Circuit. This case concerns an agency action in which the DOE issued a stay postponing the effective date of two provisions of the Test Procedures Rule, whereas the Seventh Circuit litigation challenges the Test Procedures Rule itself. The current action concerns an entirely distinct issue, as well as a separate rule with a separate administrative record, than that before the Seventh Circuit."

Op. 18, ECF No. 23; *see also id.* at 13 (citing *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 193 (2d Cir. 2004)).

Accordingly, DOE's motion to dismiss for lack of
jurisdiction on this basis is denied.

## B.   DOE's Motion to Dismiss This Action as Moot is Denied

DOE has moved to dismiss this case as moot because the
agency action NRDC challenges is no longer in effect. Def.'s
Mem. Supp. Mot. Dismiss 1, ECF No. 57. DOE argues that, since it
has lifted the Administrative Stay and the formerly postponed
provisions of the Test Procedures Rule have gone into effect, a
judgment would have no practical effect on the parties' legal
rights and any declaratory judgment regarding the Administrative
Stay would be an impermissible advisory opinion. *Id.* For the
reasons that follow, DOE's motion to dismiss for mootness is
denied.

### 1. Background and Facts

The procedural and factual background of this case
have been set forth above. Additional facts follow.

Under 10 C.F.R. § 430.27(f)(2), DOE can grant a waiver
from a test procedure if it "determines either that the basic

model(s) for which the waiver was requested contains a design
characteristic that prevents testing of the basic model
according to the prescribed test procedures, or that the
prescribed test procedures evaluate the basic model in a manner
so unrepresentative of its true energy or water consumption
characteristics as to provide materially inaccurate comparative
data." While a petition for a waiver is pending, DOE can issue
an interim waiver "if it appears likely that the petition for
waiver will be granted and/or if DOE determines that it would be
desirable for public policy reasons to grant immediate relief
pending a determination on the petition for waiver." 10 C.F.R.
§ 430.27(e)(2).

On April 6, 2017, JCI petitioned DOE for a waiver and
interim waiver from the relevant provisions of the Test
Procedures Rule. AR 90-95. DOE took no action on this petition,
instead choosing to grant JCI a 180-day extension of its
obligation to comply with the Test Procedures Rule on June 2,
2017, followed by the full Delay Rule in July 2017. AR 66-67;
SAR 1-2. NRDC filed this action to challenge the Delay Rule on
September 14, 2017. Compl., ECF No. 1.

JCI amended its petition for a waiver and interim
waiver on June 5, 2018, the same day NRDC moved for summary

judgment in this case. *See* Notice of Petition for Waiver of
Johnson Controls, Inc. from the Department of Energy Central Air
Conditioners and Heat Pumps Test Procedure; Notice of Grant of
Interim Waiver, 83 Fed. Reg. 40011, 40015-25 (Aug. 13, 2018).
JCI's amended petition merely "update[d]" its original petition,
*id.* at 40018, requesting the exact same relief based on the same
arguments with largely cosmetic restyling. *Compare id.* at 40018-
20 *with* AR 91-93.

Despite the fact that JCI's petition had been pending
for more than fifteen months, DOE had taken no action on it as
of July 25, 2018, the date oral argument was initially scheduled
in this case. Instead, two days before oral argument, DOE
informed the Court and NRDC that it expected to take action on
JCI's petition sometime the following week. ECF No. 49. It
subsequently granted JCI an interim waiver on August 3, 2018,
stated that it was "likely" to grant JCI a long-term waiver, and
announced that it was "lifting" the Delay Rule. Energy
Conservation Program: Test Procedures for Central Air
Conditioners and Heat Pumps, 83 Fed. Reg. 39873, 39874 (Aug. 13,
2018).

As a result of the two actions, the substantive
situation regarding JCI's R-407C outdoor units is the same: they

16

are not subject to the Test Procedures Rule and can be marketed
without complying with the test procedures for unmatched units
shipped without their intended refrigerant.

## 2. The Applicable Standard

"It is well settled that 'a defendant's voluntary
cessation of a challenged practice does not deprive a federal
court of its power to determine the legality of the practice.'"
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*,
528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's
Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also, e.g., Knox v.
Serv. Emp. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)
("The voluntary cessation of challenged conduct does not
ordinarily render a case moot[.]"); *Cnty. of L.A. v. Davis*, 440
U.S. 625, 631 (1979) ("[A]s a general rule, voluntary cessation
of allegedly illegal conduct does not deprive the tribunal of
power to hear and determine the case, i.e., does not make the
case moot.") (internal quotation marks and citation omitted);
*City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421
(D.C. Cir. 1994) ("[I]f a plaintiff . . . attacks an isolated
agency action, then the mooting of the specific claim moots any
claim for a declaratory judgment that the specific action was

17

unlawful, unless the specific claim . . . falls within the
'voluntary cessation' doctrine[.]") (citations omitted).

A defendant's voluntary change of conduct only renders
a case moot if the defendant demonstrates both that "(1) there
is no reasonable expectation that the alleged violation will
recur and (2) interim relief or events have completely and
irrevocably eradicated the effects of the alleged violation."
*Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir.
2016) (quoting *Granite State Outdoor Advert., Inc. v. Town of
Orange*, 303 F.3d 450, 451 (2d Cir. 2002)); *see also Davis*, 440
U.S. at 631 ("When both [of these] conditions are satisfied it
may be said that the case is moot[.]").

The "burden of showing mootness logically falls on the
defendant because, 'by the time mootness is an issue, the case
has been brought and litigated, often (as here) for years. To
abandon the case at an advanced stage may prove more wasteful
than frugal.'" *Mhany Mgmt.*, 819 F.3d at 603 (quoting *Laidlaw*,
528 U.S. at 191-92). This is "both a stringent and a formidable
burden." *Id.* at 604 (citations omitted). It requires a "showing
that it is absolutely clear the allegedly wrongful behavior
could not reasonably be excepted to recur." *Id.* at 603-04
(quoting *Laidlaw*, 528 U.S. at 190). Courts look at voluntary

cessation of challenged conduct particularly skeptically where it "appear[s] to track the development of th[e] litigation." *Id.* at 604.

### 3. DOE Has Not Established That It Could Not Reasonably Be Expected to Delay the Test Procedures Rule Again

DOE has not categorically stated that it will not again delay the provisions of the Test Procedures Rule, but only that "there is no reasonable expectation" that it will. Def.'s Mem. Supp. Mot. Dismiss 8, ECF No. 57. In the context of the regulatory and judicial actions related to this case, it is reasonable to expect that DOE may reissue a delay of the Test Procedures Rule at any time it feels that JCI's exemption is threatened. At a minimum, it is not "absolutely clear" that the converse is true. *Mhany Mgmt.*, 819 F.3d at 605.

DOE has stated that it has withdrawn the Delay Rule and does not intend to reissue it if (a) its new waiver to JCI goes into effect or (b) it denies JCI's amended waiver petition and thus concludes in its own discretion that the Test Procedures Rule does not misrepresent the energy products of JCI's products. Def.'s Mem. Supp. Mot. Dismiss 9, ECF No. 57. In these two limited situations, DOE says, it does not expect that it would again delay the Test Procedures Rule. *Id.* However, this

stated intent is not binding. *See, e.g., Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003) (discounting statement of intent where government defendant did not bind future administrations); *Farez-Espinoza v. Napolitano*, No. 08 Civ. 11060 (HB), 2009 WL 1118098, at *7 (S.D.N.Y. Apr. 27, 2009) (claims not moot where the government did not state that it will not subject the petitioner to the challenged conduct again).

In addition, as to the second scenario, DOE's explanation does not rule out the reasonable possibility that it will wish to exempt JCI from the Test Procedures Rule even if it denies a waiver. To issue a waiver, DOE must find that the Test Procedures Rule misrepresents the energy usage of JCI's products, 10 C.F.R. § 430.27(f)(2).[1] A Section 705 stay, however, requires no such conclusion. Indeed, according to DOE, it is within its unreviewable discretion any time it determines that "justice so requires," applying any standard or no standard at all. Def.'s Mem. Supp. Mot. Dismiss & Summ. J. 10, ECF No. 30. JCI's request for an administrative stay proposed five grounds for a stay, none of which turned on a conclusion that the Test Procedures Rule misrepresents the energy usage of JCI's products. *See* AR 70-72. DOE already accepted these arguments

---

[1]    Neither JCI nor DOE has contended that the other basis for a waiver under 10 C.F.R. § 430.27(f)(2), "a design characteristic that prevents testing of the basic model according to the prescribed test procedures," is applicable here.

once in issuing the Delay Rule, and can reasonably be expected to do so again even if it rejects JCI's separate claim for a waiver on one specific ground. Thus, the single finding that DOE identifies does not establish whether it is reasonable to expect that DOE may reissue the challenged stay.

Furthermore, DOE's suggestion that it would not again delay the Test Procedures Rule in two specific situations does not amount to an assurance that it will not do so in any reasonably plausible scenario. To the contrary, JCI's challenge to the Test Procedures Rule remains pending in the Seventh Circuit, and DOE's position throughout this litigation has been that it can indefinitely stay the Test Procedures Rule as long as that challenge exists. *See, e.g.*, Def.'s Mem. Supp. Mot. to Dismiss & Summ. J. 19-20, ECF No. 30; Def.'s Mem. Opp. Pl.'s Mot. Summ. J. 24-25, ECF No. 46.

Relatedly, DOE has demonstrated an interest in exempting JCI from the Test Procedures Rule through any means available to it. It granted JCI a 180-day extension, AR 66-67; it granted JCI's request for an indefinite stay under Section 705, SAR 1-2; it granted JCI an interim waiver, 83 Fed. Reg. at 40012; and it has explicitly stated it is "likely" to grant JCI's petition for a long-term waiver, *id.* Where a defendant has

21

shown a prolonged pattern of attempting to take an action, the Court can reasonably expect it to do so again in the future should the opportunity or need arise. *See, e.g.*, *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1207 (11th Cir. 2007) (describing "the first voluntary cessation factor [as] whether the challenged conduct was isolated or part of a pattern"). This expectation is reinforced by the fact that DOE's latest action, granting JCI an interim waiver, contains just as thin an analysis as the Delay Rule itself. *See* 83 Fed. Reg. at 40,012.

In addition, given the conclusory reasoning of the interim waiver and the fact that multiple organizations have already sued to challenge DOE's exemptions for JCI, it is reasonable to expect that any future long-term waiver will be subject to a challenge, whether by a competitor such as Lennox or an environmental and consumer advocacy organization such as NRD. If such a suit were successful, DOE's only recourse for promptly exempting JCI would again be to stay the Test Procedures Rule under Section 705. DOE's effort to take an action now that it hopes will obviate the need for another Section 705 stay is thus compatible with a reasonable expectation that the challenged action may recur, and does not moot NRDC's claims. *Cf. Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 678-79 (9th Cir. 2008), *rev'd on other grounds*,

555 U.S. 7 ("[O]nly a valid subsequent action can render a legal claim moot.").

One non-binding case cited by DOE, *Clean Water Action v. Pruitt*, held that an agency's voluntary cessation was sufficient to moot a case where the court concluded it was speculative to assert that a new rule might be vacated, leading the agency to issue a Section 705 stay. No. 17-817, 2018 WL 1865919 (D.D.C. 2018), *appeal pending*, No. 18-5419 (May 21, 2018). That case, however, involved a far more attenuated chain of events than here: to recur, the challenged conduct would have required both a Section 705 stay and action by California, a third party. *See id.* at 11. Moreover, here, the agency has already issued a Section 705 stay on the exact same issue; in *Clean Water Action*, by contrast, the plaintiff could identify only "[i]solated invocations of Section 705 to stay other regulations promulgated under other substantive statutes." *Id.* at 2.

DOE's claim that the conduct cannot reasonably be expected to recur must be viewed skeptically, given its timing. "The Supreme Court has viewed mootness claims skeptically when they are not timely raised." *Mhany Mgmt.*, 819 F.3d at 604. In *Mhany Management*, for example, the Second Circuit found that the

23

"suspicious timing" of the defendants' approval of a proposal to develop a relevant piece of property militated against a finding of mootness, because defendants had a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation" and did not inform the court of the proposal until well after they received it. *Id.* at 604 (alterations adopted). DOE did not say a word to the Court or NRDC about JCI's amended petition until two days before oral argument, when it identified the expected grant of that petition as a response to postpone oral argument and dismiss the case as moot. Indeed, DOE's action is so last-minute that the required comment period was still ongoing until September 12, 2018—the very date of argument in this case. *See* 83 Fed. Reg. at 40011.

Given these circumstances, where recurrence is possible in multiple scenarios and the timing suggests an intent to thwart the Court's jurisdiction, DOE has not carried its heavy burden. *See, e.g.*, *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) ("[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction."); *U.S. v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996) ("We also think it is significant that the change of policy was instituted on the eve of the lawsuit. The

Transit Authority emphasizes that the change had been under
consideration long before the federal lawsuit, but that of
course cuts two ways."); *Ahrens v. Bowen*, 852 F.2d 49, 53 (2d
Cir. 1988) (affirming district court finding that announcement
of change "on the eve of plaintiffs' motion for summary
judgment" suggested that it was merely "an attempt . . . to
conjure up an argument for mootness and thwart adjudication of
the issue"). There is no question that DOE is "free to return to
[its] old ways[, which,] together with a public interest in
having the legality of the practices settled, militates against
a mootness conclusion." *United States v. W.T. Grant Co.*, 345
U.S. 629, 632 (1953) (citations omitted). At an absolute
minimum, "[t]here are simply too many questions . . . for [the
Court] to conclude that it is 'absolutely clear' that the
parties will not resume the challenged conduct." *Mhany Mgmt.*,
819 F.3d at 605.

DOE's citations reinforce this conclusion. In *Natural
Resources Defense Council v. United States Nuclear Regulatory
Commission*, for example, the plaintiff challenged a rule on
substantive grounds and on the ground that it was issued without
notice and comment. 680 F.2d 810, 813 (D.C. Cir. 1982). The
defendant subsequently held notice and comment proceedings and
repromulgated the rule. *Id.* The D.C. Circuit found that the

25

plaintiff's notice and comment claim was now moot--but
explicitly noted that its claims concerning the validity of the
rule were not moot, even though the challenged rule had been
superseded by the repromulgated rule. *Id.* at 814 & n.9. This
suggests at most that NRDC's notice and comment claim may be
moot--and even that conclusion is premature, because DOE issued
the interim waiver without notice or comment and had barely even
started its notice and comment period for the expected permanent
waiver when it filed its motion to dismiss.

DOE's other citations include per curiam opinions that
simply stated that the defendants had met their burden in that
particular case, without providing reasoned analysis as to why
the standard for voluntary cessation had been met. *See Sussman
v. Crawford*, 548 F.3d 195, 199 (2d Cir. 2008) (per curiam);
*Tawwab v. Metz*, 554 F. Supp. 22, 24 (2d Cir. 1977) (per curiam).
Still others involve "conduct [that] ends because of an event
that was scheduled before the initiation of the litigation, and
is not brought about or hastened by any action of the
defendant." *Am. Civil Liberties Union of Mass. v. United States
Conference of Catholic Bishops*, 705 F.3d 44, 55 (1st Cir. 2013).
Such cases provide no support for DOE's attempt to distinguish
this case from the ordinary rule that voluntary cessation by a
defendant does not moot a pending action.

26

DOE also relies on cases that "treated governmental officials' voluntary conduct 'with more solicitude' than that of private actors." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 n.15 (10th Cir. 2010) (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)). Of course, even such courts acknowledged "the general practice of courts applying *Laidlaw*'s heavy-burden standard in the governmental context." *Id.* The Second Circuit has accorded particular deference to "a legislative body's representations that certain conduct has been discontinued," *Lamar Advert. Of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 376 (2d Cir. 2004), but even in that most deferential context "some deference does not equal unquestioned acceptance." *Mhany Mgmt.*, 819 F.3d at 604. Any deference owed because DOE is a government entity is limited, as illustrated by the countless cases finding an executive actor's voluntary cessation insufficient to moot ongoing litigation. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993); *Global Tel\*Link v. FCC*, 866 F.3d 397, 413-14 (D.C. Cir. 2017); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 219-20 (4th Cir. 2017); *Nat. Res. Def. Council v. Cnty. of L.A.*, 840 F.3d 1098, 1102-05 (9th Cir. 2016); *Mhany Mgmt.*, 819 F.3d at 603-05; *U.S. Dep't of Justice Fed. Bureau of Prisons Fed. Corr.*

27

*Complex Coleman, Fla. v. Fed. Labor Relations Auth.*, 737 F.3d
779, 782-84 (D.C. Cir. 2013); *Lankford v. Sherman*, 451 F.3d 496,
502-04 (8th Cir. 2006); *N.Y. Pub. Interest Research Group v.*
*Whitman*, 321 F.3d 316, 327 (2d Cir. 2003); *Farez-Espinoza v.*
*Napolitano*, No. 08 Civ. 11060 (HB), 2009 WL 1118098, at *7
(S.D.N.Y. Apr. 27, 2009); *Hilton v. Wright*, 235 F.R.D. 40, 47-50
(N.D.N.Y. 2006).

### 4. Interim Events Have Not Completely and Irrevocably Eradicated the Effects of the Violation

DOE has failed to show that "interim relief or events
have completely and irrevocably eradicated the effects of the
alleged violation," *Granite State Outdoor Advert.*, 303 F.3d at
451 (citation omitted), which would be an independently
sufficient basis for denying its motion.

An agency's replacement of a challenged action with
one that "disadvantages [plaintiffs] in the same fundamental
way" cannot moot a pending challenge. *Ne. Fla.*, 508 U.S. at 662;
*cf. Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227
n.13 (2d Cir. 1998) (relying on *Northeastern Florida* to construe
plaintiffs' claims as challenging a replacement action). This is
so even if the agency takes "a more conservative approach" that
limits the scope or harm of its original action. *Global*

*Tel\*Link*, 866 F.3d at 413. A replacement action that "disadvantages [plaintiffs] in the same fundamental way" does not moot a challenge even if it "disadvantage[s] them to a lesser degree than the old one." *Ne. Fla.*, 408 U.S. at 662. As long as the new action "is sufficiently similar to the repealed [action] that it is permissible to say that the challenged conduct continues," a case is not moot. *Id.* at 662 n.3; *accord, e.g., Edelhertz v. City of Middletown*, No. 12 Civ. 1800 (VB), 2013 WL 4038605, at \*4 (S.D.N.Y. May 6, 2013).

DOE does not dispute that its replacement action, the interim waiver from the Test Procedures Rule it has granted to JCI (and the long-term waiver it expects to grant), is similar to the Delay Rule and disadvantages NRDC in the same fundamental way. Quite to the contrary, DOE explicitly stated that the "waiver petition process is a . . . more tailored approach" to achieve the exact same ends as the Delay Rule. 83 Fed. Reg. at 39874. The Delay Rule prevented JCI from needing to comply with the Test Procedures Rule; the waiver petition process produces the exact same result. DOE's conduct thus "disadvantages [NRDC] in the same fundamental way," *Ne. Fla.*, 508 U.S. at 662, by freeing outdoor units using R-407C from the requirements of the Test Procedures Rule, with the attendant harms to energy

efficiency, consumers' energy costs, and the environment. *See* AC 11-14, ECF No. 25.

The interim waiver is just as conclusory as the Delay Rule, merely reciting that DOE reviewed JCI's materials, that it has the same "current understanding" as JCI, and that a waiver is "desirable for public policy reasons." 83 Fed. Reg. at 40012. The bulk of NRDC's arbitrary and capricious arguments apply just as much to this conclusory, unreasoned action. *Cf.* Pl.'s Mem. in Supp. Mot. Summ. J. 13-16, ECF No. 39 (explaining why Delay Rule's analysis was insufficient); Pl.'s Mem. Further Supp. Mot. Summ. J 2-5, ECF No. 48 (same). Where a replacement action embodies the same flaws as the originally challenged action, a pending claim is not moot. *See, e.g.*, *Lamar Advert.*, 356 F.3d at 378 ("Of course, a plaintiff's claims will not be found moot where the defendant's amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did at the outset.").

In short, DOE's actions do not "completely and irrevocably eradicate[] the effects of the alleged violation" and do not moot this case. *Granite State Outdoor Advert.*, 303 F.3d at 451.

For these reasons, DOE's motion to dismiss this action as moot is denied.

## IV. NRDC's Motion to Supplement the AR is Granted

NRDC has moved to supplement the AR to include the Federal Register Notice in which DOE published the Delay Rule, *i.e.*, the rule which is being challenged in this case. The proposed Supplemental Administrative Record ("SAR") consists solely of that notice, Energy Conservation Program: Test Procedures for Central Air Conditioning and Heat Pumps, 82 Fed. Reg. 32,227 (July 13, 2017). NRDC argues that the crucial date for determining when the Delay Rule was issued is the date it was filed with the office of the Federal Register and thus made available for public inspection, and the Federal Register Notice should therefore be included in the administrative record. *See, e.g.*, Pl.'s Mem. Supp. Mot. Summ. J. 19-21, ECF No. 39.

"The Administrative Procedure Act and the cases require that the complete administrative record be placed before a reviewing court." *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975). The complete administrative record includes materials that agency decision-makers directly or indirectly considered. *See, e.g.*, *Hadwan v. U.S. Dep't of*

31

*State*, 340 F. Supp. 3d 351, 355 (S.D.N.Y. 2018); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012). While supplementation is rare, "[i]f an agency did not include materials that were part of its record, whether by design or accident, then supplementation is appropriate." *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) (citation omitted).

      The Federal Register Notice is the official record that DOE filed the Delay Rule with the Office of the Federal Register. Without it, the Delay Rule would be invalid. See 44 U.S.C. § 1507 ("A document required ... to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register[.]); *see also Abraham*, 355 F.3d at 196 ("[P]ublication in the Federal Register . . . is the culminating event in the rulemaking process."); *Pub. Citizen Inc. v. Mineta*, 343 F.3d 1159, 1161 (D.C. Cir. 2003) ("We hold that an order has not been 'issued' until it has been filed with the Office of the Federal Register and thus made available for public inspection."). "[F]ederal register notices pertaining to the rulemaking" are therefore "'[k]ey' rulemaking or administrative record documents." Leland E. Beck, Admin. Conference of the

United States, Agency Practices and Judicial Review of
Administrative Records in Informal Rulemaking, at 29 (May 14,
2013),
https://www.acus.gov/sites/default/files/documents/Agency%20Prac
tices%20and%20Judicial%20Review%20of%20Administrative%20Records%
20in%20Informal%20Rulemaking.pdf.

        In light of its significance, the Federal Register
Notice of a challenged agency action is contained in the
administrative record in virtually every case, as long as such a
Notice was published. In the rare instances where agencies have
omitted the Federal Register Notice from an administrative
record, courts have compelled their inclusion. *See, e.g.*,
*Defenders of Wildlife v. Dalton*, 24 CIT 1116, 1119 (2000).

        For these reasons, NRDC's motion to supplement the AR
is granted and the Supplemental Administrative Record ("SAR") is
part of the record before the court.

**V.   DOE's Motion for Summary Judgment is Denied and NRDC's
       Cross-Motion for Summary Judgment is Granted**

        A.   The Applicable Standard

Under the APA, a court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

In reviewing whether an agency action is "arbitrary, capricious, [or] an abuse of discretion," the court evaluates whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."). An agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. A "conclusory statement . . . falls well short of the APA's 'requirement that an agency provide reasoned

34

explanation for its action.'" *Batalla Vidal v. Nielsen*, 279 F.
Supp. 3d 401, 430 (E.D.N.Y. 2018) (quoting *FCC v. Fox Tele.
Stations, Inc.*, 556 U.S. 502, 516 (2009)); *see also Dickson v.
Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995),
("[C]onclusory statements . . . do not meet the requirement that
the agency adequately explain its result."). These rules apply
equally to the creation of regulatory requirements and to "the
removal of a regulation." *State Farm*, 463 U.S. at 42. When an
agency changes its position, it must "display awareness that it
is changing position" and "show that there are good reasons for
the new policy." *Fox Tele.*, 556 U.S. at 515. If the
administrative record does not contain a reasoned analysis, the
court "may not supply a reasoned basis for the agency's action
that the agency itself has not given." *State Farm*, 463 U.S. at
43 (citation omitted).

When alleging that an agency action is "without
observance of procedure required by law" or "otherwise not in
accordance with law" pursuant to 5 U.S.C. § 706(2)(A), (D),
"plaintiffs' burden in establishing a procedural violation is to
show that the circumstances triggering the procedural
requirement exist, and that the required procedures have not
been followed." *Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir.

1985), *abrogated on other grounds by Cottonwood Envtl. Law Ctr. V. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015).

Judicial review under the APA is unavailable, however, to the extent "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The second of these exceptions applies where a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 600 (1988) (citation omitted).

B.    Section 705 Stays Are Not Committed to Agency Discretion by Law

Before addressing the validity of the Delay Rule, the Court must dispose of DOE's contention that Section 705 stays are "committed to agency discretion by law" and are therefore unreviewable under 5 U.S.C. § 701(a)(2). Although no citations to this effect have been submitted, several courts have reviewed Section 705 stays. See *Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) (per curiam); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017); *Becerra v. U.S. Dep't of Interior*, 276

F. Supp. 3d 953 (N.D. Cal. 2017); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012). Here, DOE's contention is unavailing.

"There is a strong presumption favoring judicial review of administrative action." *Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016). The exception for agency action "committed to agency discretion" is a "very narrow exception" to this presumption, applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). When in doubt, courts "adopt[] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).

DOE contends that the requisite finding for a Section 705 stay--that "justice so requires"--is one of the rare instances where the presumption of reviewability is overcome. However, courts routinely review agency action under statutes involving similar standards. For example, most courts faced with a dispute over a finding that a contract is in the "best interests" of the Government have held the finding to be

37

judicially reviewable. See *Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 22-23 (2005) (collecting cases). Similarly, in *Rombough v. FAA*, our Circuit found that a statute allowing the administrator of the Federal Aviation Administration to "grant exemptions . . . if he finds that such action would be in the public interest" was not "an action committed to the unlimited discretion of the agency and thus beyond the scope of judicial review" even though it "incorporate[d] the term 'may' and the public interest standard." 594 F.2d 893, 895 (2d Cir. 1979) (quoting 42 U.S.C. § 1421(c) (1970)).

DOE attempts to distinguish *Rombough* because it involved a "specific review provision" in the Aviation Act. Def.'s Mem. Opp. to Pl.'s Cross. Mot. Summ. J. 3, ECF No. 46. But the Second Circuit discussed the relationship between this provision and the "general provisions of the APA" after concluding that "the public interest standard" in the Aviation Act review provision is "not subject to unbridled discretion." *Id.* Its principal basis for decision was a conventional application of the black-letter rule that "5 U.S.C. § 701(a)(2) is a 'very narrow exception' to the general principle of reviewability and applies only in those rare cases where 'statutes are drawn in such broad terms that in a given case

there is no law to apply.'" *Id.* (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 410).

Moreover, as DOE acknowledges, the D.C. Circuit found that nearly indistinguishable language ("if it finds it to be in the interest of justice") provided a judicially administrable standard in *Dickson*, 68 F.3d at 1404. *See* Def.'s Memo. Supp. of Mot. Dismiss & Summ. J. 11, ECF No. 30. DOE claims that *Dickson* is distinguishable because it "was limited to the military context." *Id.* 12. But the involvement of foreign affairs or the military typically weighs against a finding of reviewability, not vice versa. *See Dugan v. Ramsay*, 727 F.2d 192, 195 (1st Cir. 1984).

DOE principally relies for its argument against reviewability on two cases. First, DOE points to *Webster v. Doe*, in which the Supreme Court held that a statute allowing agency action when the agency "shall deem . . . necessary or advisable in the interests of the United States" committed that action to the agency's discretion by law. 486 U.S. 592 (1988). *Webster*, however, is tethered to the national security context and is therefore not persuasive in this context. *See, e.g.*, *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999) ("When it comes to matters touching on national security . . . the

presumption of review runs aground.") (internal quotation marks and citation omitted); *see also Bauer v. DeVos*, 325 F. Supp. 3d 74, 104 (D.D.C. 2018) ("Review of § 705 stay decisions sit at the opposite end of the spectrum from the review of security clearances in *Webster*.").

The second case, *Target Training International v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014), is likewise distinct from any relevant precedent. *Target Training* considered a Patent and Trademark Organization ("PTO") regulation allowing the PTO to waive certain requirements "[i]n an extraordinary situation, when justice requires." *Id.* at 939. The court focused on the first half of the regulatory standard, "extraordinary situation," and found that without any "statutory, regulatory, or case-law definition," it did not "establish a meaningful standard by which to measure the PTO's future exercise of discretion." *Id.* at 946-47. The "when justice requires" clause stated "only a hortatory purpose." *Id.* at 947. Considered in its entirety, the standard was "nebulous," in the court's view. *Id.* Moreover, the context of the phrase--a regulatory standard set by the PTO itself that governed only its ability to waive "requirements imposed only by regulations, not by statute" in a particular patent application process, *id.* at 939--did not

suggest any analogous standards, as a "settled course of adjudication" might provide, *id.* at 947.

Here, by contrast, the basic issue covered in Section 705 is a familiar one to courts: whether the relevant interests warrant a stay. According to the legislative history of the APA, the purpose of the agency's authority under Section 705 is "to prevent irreparable injury or afford parties an adequate judicial remedy." APA, Pub. L. 1944-46, S. Doc. 248 at 277 (1946). This is fundamentally the same consideration that courts address in every application for an injunction, giving content to the phrase "when justice so requires" even if the phrase might, in other contexts, be ambiguous. The Federal Rules of Civil Procedure, adopted by Congress just a decade earlier, use the phrase "when justice so requires" or "in the interest of justice" repeatedly, indicating suitability for judicial analysis. *See, e.g.,* Fed. R. Civ. P. 8, 15, 32, 61, 65. While agencies may be entitled to a degree of deference as to their determination, courts have ample ability to determine whether an agency made a finding that justice requires and whether that finding was in any meaningful way based on the facts in the administrative record. *See Bauer*, 325 F. Supp. 3d at 104 ("[T]here can be little doubt that courts are uniquely well-suited to determine whether equitable considerations warrant

staying the implementation of existing regulations pending
judicial review."). In fact, in considering Section 705 stays,
DOE has historically applied a version of the traditional
multifactor test for injunctive relief, which readily lends
itself to judicial review. *See, e.g.*, Transmission Planning and
Cost Allocation by Transmission Owning and Operating Public
Utilities, 77 Fed. Reg. 32184, 32246 (May 31, 2012); Market-
Based Rates for Wholesale Sales of Electric Energy, Capacity and
Ancillary Services by Public Utilities, 74 Fed. Reg. 30924,
30931 (June 29, 2009).

      DOE also maintains that Section 705 must be
unreviewable because it has "broad application." Def.'s Memo.
Supp. Mot. Dismiss & Summ. J. 12, ECF No. 30. But Section 705's
government-wide application counsels for finding it reviewable,
as a contrary rule would take a wide swath of agency action out
of the courts and undermine the APA's purpose and practice. No
cases have been cited holding that a portion of the APA itself
is not subject to judicial review. The few cases that have found
an agency's discretion to be so broad as to be unreviewable have
all involved authority granted to a particular agency under an
organic statute, not the basic rules of agency procedure laid
out in the APA. A finding that those rules of the road are so
amorphous as to trigger Section 701(a)(2) would conflict with

the general purpose of the APA to routinize agency procedure and
review.

In any event, "under the APA the ultimate availability
of substantive judicial review is *distinct* from the question of
whether the basic rulemaking strictures of notice and comment
and reasoned explanation apply." *Am. Med. Ass'n v. Reno*, 57 F.3d
1129, 1134 (D.C. Cir. 1995). Thus, even if DOE's novel argument
were correct and the substance of the agency's finding was
unreviewable, this Court would still have jurisdiction over the
other defects of the Delay Rule, as DOE concedes. See Def.'s
Memo. Supp. Mot. Dismiss & Summ. J. 12, ECF No. 30 ("The portion
of agency action under Section 705 that is unreviewable is
limited, however. ... [M]ultiple aspects of an agency's action
are subject to judicial review."). Thus, the Court may consider
whether the Delay Rule contains a "reasoned explanation"
supported by the administrative record even if it has no power
to review whether the Department abused its discretion in
finding that justice required a stay.

In sum, DOE has not explained why the drafters of the
APA chose a phrase commonly used to guide judicial analysis if
they meant to immunize agency action from such analysis. Nor
does it give weight to case law holding that "the question of

whether the basic rulemaking strictures of notice and comment and reasoned explanation apply" even when substantive judicial review is foreclosed. *Am. Med. Ass'n*, 57 F.3d at 1134. For the reasons just described, the Section 705 stay is not committed to agency discretion by law.

## C.   The Delay Rule Was Arbitrary and Capricious

DOE's decision to stay portions of the Test Procedures Rule indefinitely is arbitrary and capricious and therefore unlawful. See 5 U.S.C. § 706(2)(A).

DOE's reasoning was less than a sentence long, stating only that "DOE has determined to postpone the effectivenss [*sic*] of these provisions based on JCI's submissions to DOE that raise concerns about significant potential impacts on JCI, and further to ensure all manufacturers of central air conditioners and heat pumps have the same relief granted to JCI." SAR 2. Such conclusory statements cannot carry an agency's burden of providing a reasoned explanation for its action. *See, e.g., Batalla Vidal*, 279 F. Supp. 3d at 430. DOE did not explain why JCI's submissions raised concerns, or why the delay would provide any relief to other manufacturers; it simply concluded that they did so. But "[t]he agency's statement must be one of

44

'reasoning'; it must not be just a 'conclusion[.]'" *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

In addition, DOE's conclusory assertions are contrary to the record that was before it. The Delay Rule purports "to ensure all manufacturers of central air conditioners and heat pumps have the same relief granted to JCI." SAR 2. But the record establishes that only JCI could benefit from the delay, because only JCI sold units covered by the delayed provisions. AR 86, 324. AHRI, a trade association representing more than 300 manufacturers of central air conditioners and related products, had expressly told DOE that it was "not seeking to delay or rescind the [Test Procedures] Rule," AR 322, and Lennox had disavowed any desire "to be held to a less-accurate testing and representations requirement," AR 42. The entities whose interests DOE claimed to be protecting stated that a stay was not in their interests. Where an agency's cursory explanation "is simply not supported by the record," it must be invalidated. *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999); *see also State Farm*, 463 U.S. at 43 (action arbitrary and capricious where agency "offered an explanation for its decision that runs counter to the evidence before the agency").

DOE also "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The administrative record contained numerous arguments against any delay, from the benefits that the Test Procedures Rule provided consumers to factual errors in JCI's submissions. AR 322-35, 343-46. Neither the record nor the text of the Delay Rule reveals any effort to engage with these arguments by DOE, or to conclude that they need not be analyzed. "It most emphatically remains the duty of [federal courts] to ensure that an agency engage the arguments raised before it--that it conduct a process of *reasoned* decision making." *K N Energy, Inc. v. F.E.R.C.*, 968 F.2d 1295, 1303 (D.C. Cir. 1992); *see also, e.g., Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 (D.D.C. 2005) ("[A]lthough [the agency] need not consider each of [the plaintiff's] arguments on its merits, if it decides not to address these arguments, it must explain why.") (internal quotation marks and citation omitted); *California*, 277 F. Supp. 3d at 1122 (Section 705 stays that "failed to consider the benefits of the" stayed rule must be vacated).

DOE contends that any requirement that an agency address counterarguments against a Section 705 stay would "impose[] on agencies an overly prescriptive requirement to engage in cost-benefit analysis that is entirely absent from the

46

statute." Def.'s Mem. Supp. Mot. Dismiss & Summ. J. 15, ECF No. 30. "If the words 'justice so requires' are to mean anything, they must satisfy the fundamental understanding of justice: that it requires an impartial look at the balance struck between the two sides of the scale." *California*, 277 F. Supp. 3d at 1122. Because DOE refused even to look at the arguments against the stay, it failed this fundamental requirement.

The two cases that DOE cites do not support its position that its statement sufficiently provides the reasoned basis for the agency's action required by law.

*Reddy v. CFTC* dealt with an agency analysis far different from the one-sentence explanation here. 191 F.3d 109 (2d Cir. 1999). *Reddy* involved two lengthy CFTC enforcement orders--each spanning dozens of pages of factual findings and legal conclusions--imposing sanctions on petitioners. The Second Circuit rejected the petitioners' argument that the orders inadequately explained why the charged offenses were serious in nature, reasoning that agencies need not provide "a ritualistic incantation of what is well-known in the area of the agency's jurisdiction." *Id.* at 125. This holding--that it is unnecessary to repeat truisms--does not authorize sheer conclusory

statements, even looking past the chasm in detail between the CFTC orders and DOE's Delay Rule.

*Alaska Department of Environmental Conservation v. EPA* is cited for the proposition that the Court can read reasoning into "skeletal orders" from "accompanying explanatory correspondence." 540 U.S. 461, 497 (2004) ("*ADEC*"). On that basis, DOE argues that JCI's submissions can serve as a substitute for reasoning by the agency itself. Def.'s Mem. Opp. to Pl.'s Mot. Summ. J. 6, ECF No. 46. But *ADEC* held that EPA's orders were "properly read together with accompanying explanatory correspondence from EPA," not from third parties. *ADEC*, 540 U.S. at 497. Before issuing the challenged orders, EPA repeatedly informed ADEC of its concerns and why it would take action if ADEC did not address them. *Id.* at 479-80. Thus, "the Agency's comments and orders adequately ground[ed]" its determination. *Id.* at 497. Here, by contrast, the administrative record contains no statements from DOE explaining its reasoning.

DOE claims for the first time that when it said an immediate stay would "ensure all manufacturers of central air conditioners and heat pumps have the same relief granted to JCI," SAR 2, it actually meant that manufacturers would have the same relief if they manufactured similar products. *See* Def.'s

48

Mem. Opp. to Pl.'s Mot. Summ. J. 6, ECF No. 46. However, the record does not suggest that DOE concluded that such a development might occur, nor does it contain any evidence that any manufacturer other than JCI produced or intended to produce central air conditioners that could benefit from the stay. To the contrary, the record shows that multiple industry participants indicated that they did not desire a stay. Thus, DOE's statement that a stay was appropriate for the benefit of manufacturers other than JCI cannot be accepted. *See State Farm*, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action.").

In addition, DOE did not attempt to explain how its stay satisfies the four-part test for staying agency action. Instead, DOE devotes much of its reply to arguing against the application of the four-factor injunctive test. See Def.'s Mem. Opp. to Pl.'s Mot. Summ. J. 10-15, ECF No. 46. DOE is correct that, shortly before it filed its opening motion, a district court held for the first time that stays under Section 705 are not governed by any standard, even when issued by a court. See Order at 9 n.10, *Wyoming v. U.S. Dep't of the Interior*, No. 16-cv-285 (D. Wy. Apr. 4, 2018), ECF No. 215; Order at 2-5, *Wyoming v. U.S. Dep't of the Interior*, No. 16-cv-285 (D. Wy. Apr. 30, 2018), ECF No. 234. This contradicts decades of prior case law.

*See, e.g.*, *Wyoming v. U.S. Dep't of the Interior*, No. 18-8027, 2018 WL 2727031, at *2 (10th Cir. June 4, 2018) (Matheson, J., concurring in part and dissenting in part); *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010); *Scarpa v. Smith*, 294 F. Supp. 13, 14 (S.D.N.Y. 1968). As the district court explained in *Sierra Club*, "the standard for a stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test" required by the Supreme Court. 833 F. Supp. 2d at 30; *cf. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (explaining test). Here, as in *Sierra Club*, DOE "neither employed nor mentioned the four-part test in its Delay Notice" and "the failure to do so . . . is arbitrary and capricious." *Sierra Club*, 833 F. Supp. 2d at 31.

DOE contends that *Sierra Club* was wrongly decided as part of its argument that agencies' stay determinations are entirely free from judicial review. See Def.'s Mem. Supp. Mot. Dismiss & Summ. J. 10-11, ECF No. 30. However, the equitable test grows naturally out of both the language and the legislative history of Section 705. As noted above, the APA's drafters explicitly explained that the authority they granted to agencies "is equitable and should be used by both agencies and

50

courts to prevent irreparable injury or afford parties an
adequate judicial remedy." APA, Pub. L. 1944-46, S. Doc. 248 at
277 (1946).

　　　　　But even if employment of the traditional equitable
test is not required by law to issue a stay under Section 105,
DOE has long employed some version of it, as numerous examples
in the Federal Register reveal. *See Sierra Club*, 833 F. Supp. 2d
at 31 (applying test where "EPA previously has employed the
four-part preliminary injunction test in its review of requests
to stay prior agency actions"). Indeed, JCI devoted most of its
application for a stay to arguing that the four-factor test was
satisfied, AR 70-72, and recognized that the traditional four
factors "must be balanced against one another," AR 69. DOE's
failure to follow its own precedent without explanation was
arbitrary. *See, e.g.*, *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 31
(1996) ("[I]f an announces and follows-by rule or by settled
course of adjudication-a general policy by which its exercise of
discretion will be governed, an irrational departure from that
policy (as opposed to an avowed alteration of it) could
constitute action that must be overturned as "arbitrary,
capricious, [or] an abuse of discretion[.]"); *Ramaprakash v.
FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure
to come to grips with conflicting precedent constitutes an

inexcusable departure from the essential requirement of reasoned decision making.") (internal quotation marks and citation omitted).

DOE further argues that its action was not arbitrary and capricious because it had "broad latitude" to issue the Delay Rule in the face of the legal challenge to the Test Procedures Rule. Def.'s Mem. Supp. Mot. Dismiss & Summ. J. 14, ECF No. 30. But it is relevant that, at the time DOE issued the stay, the Seventh Circuit proceedings had been suspended indefinitely so that DOE and JCI could engage in settlement discussions. *See* AR 106. DOE thus had the ability to let settlement discussions, and therefore the stay, drag on indefinitely. A stay is supposed to be grounded on "the existence or consequences of the pending litigation." *Sierra Club*, 833 F. Supp. 2d at 33. Section 705 cannot be used "simply because litigation in the court of appeals *happens to be pending.*" *Id.*; *see also California*, 277 F. Supp. 3d at 1121 (rejecting stay where the agency "merely paid 'lip service' to the pending judicial review"). Where an agency stays a rule without making any effort to see the litigation to an actual conclusion, it uses the pending litigation as a pretext and thus acts arbitrarily and capriciously. *See Becerra*, 276 F. Supp. 3d at 964 (vacating rule where the agency "blocked judicial review

by obtaining a stay in the [underlying] litigation"). Notably, nothing has happened in the Seventh Circuit litigation since DOE entered the stay: there have been zero docket entries, and briefing has remained suspended for more than a year.[2] The stay is in no meaningful sense "cabined by judicial proceedings," as DOE puts it. Def.'s Mem. in Supp. of Mot. to Dismiss or Summ. J. at 15, ECF No. 30. While justice sometimes requires a stay where litigation is proceeding, it cannot require a stay where the parties are content to keep the case indefinitely on hold.[3] The purpose of such a stay is not to preserve the status quo during litigation, but to permit JCI to continue selling air conditioners whose efficiency falls below DOE standards. *See* AR 102.

For these reasons, the Delay Rule is arbitrary and capricious.

---

[2]     The Court may take judicial notice of the entries (or lack thereof) in a court's public docket. *See, e.g.*, *Magniafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006).

[3]     DOE claims "that mediation is ongoing" in the stayed litigation, Def.'s Mem. in Opp. to Pl.'s Cross-Mot. at 9, ECF No. 47, but provides no evidence to support this assertion. In any event, the issue before the Court is not the pace of the mediation, but rather whether it is arbitrary and capricious to premise an open-ended stay of a rule on litigation that has been suspended indefinitely. The absence of progress merely illustrates that courts are right to take a skeptical view of Section 705 stays issued that accompany stayed litigation. See *Becerra*, 276 F. Supp. 3d at 964; see also, e.g., Order, *Cmty. Fin. Servs. Ass'n of Am., Ltd. V. CFPB*, No. 18-cv-295, ECF No. 29 (W.D. Tex. Jun 12, 2018) (granting joint motion to stay litigation, but denying joint motion to stay agency action pending review).

### D. DOE Delayed the Test Procedures Rule After Its Effective Date

Section 705 only allows an agency to "postpone the effective date of action taken by it." 5 U.S.C. § 705. It does not allow agencies to suspend a rule that has already taken effect. See *Safety-Kleen*, 1996 U.S. App. LEXIS 2324, at *2-3 ("The statute permits an agency to postpone the effective date of a not yet effective rule, pending judicial review. It does not permit the agency to suspend without notice and comment a promulgated rule[.]"); *accord California*, 277 F. Supp. 3d at 1118-19; *Becerra*, 276 F. Supp. 3d at 964. The Test Procedures Rule originally had an effective date of February 6, 2017, rescheduled to July 5, 2017. DOE, however, did not file the Delay Rule with the Office of the Federal Register until July 12, 2017--seven days after the purportedly rescheduled effective date of July 5, 2017 and five months after the actual effective date of February 6, 2017.

The Test Procedures Rule's original effective date, February 6, 2017, was not appropriately amended. The February Final Rule purporting to delay that date was published on February 2, 2017. AR 349. But "[t]he APA generally requires that, prior to issuing a final rule, an agency should provide

54

both notice and an opportunity for comment to the public" and that "publication of a final substantive rule should precede its effective date by at least thirty days." *Abraham*, 355 F.3d at 204 (citing 5 U.S.C. § 553(c)-(d)). DOE violated both of these requirements. While DOE claimed that the February Final Rule was "exempt from notice and comment because it constitutes a rule of procedure" and was alternatively exempt for "good cause," AR 349, the Second Circuit has rejected these exact arguments about an indistinguishable delay. *See Abraham*, 355 F.3d at 205-06. Accordingly, the February Final Rule "failed to amend the original standards' designated effective date" and thus the Delay Rule was issued some five months after the Test Procedures Rule had taken effect. *Id.* at 206. The March Final Rule was invalid for the same reason. See AR 348.


Even the invalidity of the February and March Final Rules are not relied upon, however. The Federal Register Notice for the Delay Rule reveals that the notice was not filed with the Office of the Federal Register until July 12, 2017. SAR 2. The Federal Register Act provides that a document that must be published in the Federal Register "is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register and a copy

55

made available for public inspection." 44 U.S.C. § 1507. As
courts have repeatedly held, the relevant date for a rule's
issuance is therefore the date of publication in the Federal
Register. See, e.g., *Abraham*, 355 F.3d at 196 ("[P]ublication in
the Federal Register . . . is the culminating event in the
rulemaking process.");. *Mineta*, 343 F.3d at 1161; ("We hold that
an order has not been 'issued' until it has been filed with the
Office of the Federal Register and thus made available for
public inspection."); *Fla. Manuf. Housing Ass'n, Inc. v.
Cisneros*, 53 F.3d 1565, 1573 (11th Cir. 1995) (rejecting
argument "that the rule was issued when the rulemaking decision
was dated, not when it was published").

DOE asserts nevertheless that the Delay Rule was
issued on July 3, 2017, citing the Rule's signatory line. Def.'s
Mem. Supp. Mot. Dismiss & Summ J. 16, ECF No. 30 (citing AR 5
("Issued in Washington, DC on July 3, 2017.")). This exact
argument has been rejected previously. *See Mineta*, 343 F.3d at
1164-68 (rejecting argument that rule was issued on day it was
signed, rather than day it was filed with OFR). DOE also points
to its attachment of the text of the Delay Rule to a notice
filed in a district court case in Texas on July 3, 2017 and its
purported posting on a DOE website the same day. As an initial
matter, only the former can properly be considered. The

declaration's assertion of the date of the purported website posting is based not on the declarant's recollection but on the content of unidentified "records" not placed into evidence. *See* Corfield Decl. ¶ 2. The mere act of submitting the text of a rule to one court does not constitute making a rule "available for public inspection." *Mineta*, 343 F.3d at 1167. Such a rule would allow an agency to manipulate public notice and statutes of limitation to a wholly inappropriate degree. *Cf. Fla. Manuf. Housing Ass'n*, 53 F.3d at 1574 ("[I]f HUD's interpretation were adopted, the agency conceivably could release its final rule to the public thirty, forty, fifty, or more days after the stated date of decision and thereby impede or prevent any judicial review.").

Even if the purported website posting is accepted, the same result would follow. The Federal Register Act requires that documents be "filed with [OFR] and a copy made available for public inspection as provided by [44 U.S.C. § 1503]." 44 U.S.C. § 1507. These requirements are conjunctive, not disjunctive, precluding DOE's argument. Nor does online posting qualify as making a document "available for public inspection" under 44 U.S.C. § 1503 (documents shall be "available for public inspection in the [OFR]").

Moreover, just two years ago DOE explicitly amended
its regulations for issuing energy efficiency standards to allow
"error correction" between "post[ing] a rule with the
appropriate official's signature" and "publication in the
Federal Register." Energy Conservation Program: Establishment of
Procedures for Requests for Correction of Errors in Rules, 81
Fed. Reg. 26998, 26999 (May 5, 2016). In doing so, it
acknowledged the well-settled APA "mandate[]" that no rule is
"effective until after [the agency] has published the rule in
the Federal Register." *Id.* at 27002. Similarly, DOE accepted the
arguments of commenters explaining that issuance requires
"publication in the Federal Register." Prevailing Rate Systems;
Redefinition of the Asheville, NC, and Charlotte, NC,
Appropriated Fund Federal Wage System Wage Areas, 81 Fed. Reg.
57745, 57751 (Aug. 24, 2016). DOE's unexplained departure from
its prior position must be rejected, because "[w]hen an agency
departs from its own prior precedent without explanation . . .
its judgment cannot be upheld." *Manin v. Nat'l Transp. Safety
Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

DOE also argues that the phrase "effective date" in
Section 705 does not actually mean "effective date." Def.'s
Memo. Supp. Mot. Dismiss & Summ. J. 18, ECF No. 30 ("[T]he
meaning of the term 'effective date' as it appears in Section

705 cannot be limited to the 'effective date' of a rule as that term appears in 5 U.S.C. § 553(d)."). This argument has been rejected. *See Safety-Kleen*, 1996 U.S. App. LEXIS, at *2-3 (Section 705 "does not permit the agency to suspend without notice and comment a promulgated rule"); *California*, 277 F. Supp. 3d at 1118 ("The plain language of the statute authorizes postponement of the 'effective date,' not 'compliance dates.'"); *Becerra*, 276 F. Supp. 3d at 964 (same). DOE's "policy arguments cannot overcome the statute's plain language." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1667 (2017) (internal quotation marks omitted).

Accordingly, NRDC's motion for summary judgment is granted and DOE's motion for similar relief is denied.

## VI. Conclusion

Based on the conclusions set forth above, DOE's motion to dismiss for lack of jurisdiction or for summary judgment is denied, as is its motion to dismiss this action as moot. NRDC's motion to supplement the record and its cross-motion for summary judgment are granted. This matter is remanded to DOE for further proceedings consistent with this Opinion.

It is so ordered.

**New York, NY**
**February 2/, 2019**

**ROBERT W. SWEET**
**U.S.D.J.**